### EDMANDS v. PERLMAN.

(Circuit Court of Appeals, Third Circuit. December 6, 1918. Rehearing Denied March 10, 1919.)

#### No. 2404.

PATENTS &⇒328—VALIDITY AND INFRINGEMENT—ELECTRICAL SURGICAL BAKER.
   The Edmands and Hoyt patent, No. 775,105, for an electrical surgical baker, was not anticipated, discloses invention, and is entitled to a construction broad enough to protect the valuable contribution of the patentees to the art; also *held* infringed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by Alberta F. Edmands against Henry Perlman, doing business as the Crown Electric Hot Pack Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 248 Fed. 731.

Macleod, Calver, Copeland & Dike, of Boston, Mass., and Monroe Buckley, of Philadelphia, Pa. (George P. Dike, of Boston, Mass., of counsel), for appellant.

Daniel J. McBride and W. Preston Williamson, both of Philadelphia, Pa., for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. The subject here involved is the treatment of some part of the human body by confining and applying electric light and electric heat by means of an enveloping chamber. The record discloses that in that general prior art was a patent, No. 664,081, to one Gohlin, issued in 1900. It shows that Gohlin conceived the idea of applying heat and light generated by electricity to the whole of the human body below the shoulders. He used two structures, each mounted on a standard and wheeled up on either side of the bed, cot, or table on which the patient rested. From these sup-

---

porting standards curved parts projected inwardly and formed a top, and the two met and made a chamber substantially the length of the human body. Curtains were then drawn at the end of each chamber and the electricity turned on. There was no suggestion in the patent of the use of Gohlin's apparatus, other than to inclose the entire body; nor were the parts of the structure such that the size or shape of the chamber could be changed. What he states in his specification, and what his figures disclose, is a large, cumbersome apparatus of unchangeable proportions, designed to treat the human body as a whole.

Such remained the state of the art, and presumably the use of chambered electricity, for some 2½ years thereafter, when the patent in suit was applied for. It is quite manifest that when this patent was applied for, and its specification drawn, the applicant was unaware of what Gohlin had done, or of his patent, and when that patent was cited against his application he realized his entire specification described the art in an inadequate way, and that the broad first claim which he made would have covered Gohlin's device. When thus apprised, he at once withdrew his application, erased a number of his figures, and filed a new application and new claims, which properly described what he brought into the art.

An examination of this new application shows that what the patentee really did was to devise a simple, easily movable, readily adjustable apparatus, without standards or support. It was adapted to take such different forms that it could be used on any limb or part of the body, and thus create a chamber which could in size and shape bring its walls into closer relation to the member to be affected by its radiated heat and light. He dispensed with standards, by suspending his simple apparatus by ceiling cords. This allowed it to be swung about, and to be placed in any position desired, and dispensed with standards. Second. He made the structure a unitary movable one, which could be picked up by a handle. Third. He made it a unitary structure, by disclosing for the first time the use of a hinge, which allowed the sides to be adjusted, so as to conform to the limb or the part that is being treated, or, in other words, to be, so to speak, wrapped about the heated part. Fourth. He disclosed elements that were not shown in Gohlin's structure, which was two-part, mounted on standards, had a chamber of one fixed size, and adapted for application to the whole body.

As to those elements which alone embodied the present plaintiff's invention, and contrasting them with Gohlin's invention, we see that the only thing in common between him and Gohlin was an electric chamber. But as to those things which were new, and which are referred to above, there was nothing in Gohlin's patent which required the patentee in any way to limit or modify his claims, so long as he restricted them to the elements of novelty which he disclosed in his specification.

Bearing this in mind, we see that Gohlin's patent had no other significance or effect in the proceedings in the Patent Office than to restrict the patentee to those elements of novelty which he showed; but in so far as those elements of novelty were themselves concerned, and

his right to have claims commensurate with those disclosures, his application stood unaffected by Gohlin's patent. It was a red flag, which warned the applicant to keep off the path which Gohlin had pre-empted, but which in no way restricted his right to the new path which he himself had disclosed.

What, then, was the apparatus which the present patentee disclosed, and what claims were allowed him? His apparatus consisted of a simple structure suitable for limb treatment. His new idea of adjustment of the sides of his chamber, which adjustment could not have taken place in Gohlin's structure, but which enabled him to closely chamber a limb of the body, was provided for by a hinge at the upper end of the chamber sides, and this was embodied in his claim, to wit:

"The improved surgical baker, comprising the opposite side sections hinged together at the upper ends thereof, and adjustable toward and from each other, to vary the distance between them, and provided with means of holding the same in their position of adjustment."

It is quite evident that the particular form in which those opposite side sections were commercially built, whether they took the form of the side of a Gothic arch, as he appeared to have worked out in practice, or the quadrant of a circle, as he showed in Figure 2, with an arch flattened at the top, were matters of functional indifference. The point was that, whatever form they took, the two sides of the chamber were to be adjustable to and from each other, and this adjustability was to be secured by a hinge at the upper ends of the chamber sides, and when the desired position was obtained the hinge was controlled by a set screw. His second idea of ceiling suspensory support was embodied in his second claim by adding to it the element of an "overhead suspensory support." His third element was for the hinge novelty of his first claim, with the addition of electrical equipment.

This little structure appears to have met a need in the art. The proofs showed that, from 4 used in 1903, there was a gradual increase to 97 in 1913, at which time the merit of the device seemed to have been recognized by the medical profession, for in 1914 the sales sprang to 207, and have increased from that time to the hearing before the court. When the further fact is considered that this apparatus is not for individual use, but obviously intended for general use in hospitals, that it has been sold in Canada, Australia, and gone abroad, it is quite evident that it has up to this time met a public need, and that in all probability the remaining 2 years of the patent's life will be the period of its greatest value. During all these years there is no proof that any one challenged the patent or trespassed upon its commercial monopoly, until the defendant manufacturing company has lately put the alleged infringement upon the market. That its functional purpose is to do exactly what this patentee saw, and has for 14 years been doing, is quite clear. It shows a small, compact structure, adapted to suspension, capable of adjustment to limbs, unitary, and of such size as to be readily portable. Functionally, and in its adaptability, it does everything in the same way and for the same purpose that this plaintiff patent disclosed 14 years before.

That it may be a slight improvement over the plaintiff's structure may be admitted, but the question still remains: Did it infringe the claim by which the original patentee's disclosure was protected? That it has side walls, and that those side walls are adjustable by hinge movement from the top, is the fact. It seeks to escape infringement by reading into the plaintiff's claim a limitation to a single hinge, which physically and alone connects the plaintiff's two chamber sides, and by superimposing a third member at the top of its own chamber, which has a hinge at each end, connecting with the upper ends of its side structure, it would avoid infringement. But functionally the defendant's two hinges are the mechanical equivalent of the plaintiff's one hinge, in that the hinge mobility of both mechanisms alike effects the chamber side adaptability which this patent brought into the art. It is manifest the defendant does not use his two hinges to eliminate the function of chamber side adaptability, but solely to mask infringement.

It is clear to us that the plaintiff's claim must be read in a way to give the hinged connection, which he brought into the art, the functional breadth which would cover any hinge arrangement which, while escaping the mere form of the plaintiff's structure, embodied and secured all its hinge-functional purpose. The art has respected the monopoly of the plaintiff for 14 years, and it is quite evident to us that the value and success of this little structure have tempted this defendant manufacturing company to appropriate its substance by the substitution of what is a mere mechanical expedient, which, while it respects the literalism of the claim, filches the soul and substance of the disclosure which the claim was given him to protect.

This case must be reversed, and infringement decreed.